**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>*ex rel.* **TODD HEATH**<br>120 West Jefferson Street<br>Waupun, WI 53963,<br>　　　　　Relator, | : |
| | : |
| | : |
| | : |
| | : |
| **STATE OF CALIFORNIA**<br>The Attorney General's Office<br>California Dept, of Justice<br>ATTN: False Claims Unit<br>PO Box 944255<br>Sacramento, CA 94244-2550; | : |
| | : **FILED UNDER SEAL PURSUANT** |
| | : **TO 31 U.S.C. § 3730** |
| **STATE OF DELAWARE**<br>Department of Justice<br>Attorney General's Office<br>The Carvel State Office Building<br>820 N. French Street<br>Wilmington, DE 19801; | : |
| | : **Civil Case No. 1:11-cv-01897-RJL** |
| **STATE OF FLORIDA**<br>Office of the Attorney General<br>State of Florida<br>The Capitol PL - 01<br>Tallahassee, FL 32399-1050; | : |
| | : **JURY TRIAL DEMANDED** |
| **STATE OF HAWAII**<br>Department of Attorney General<br>State of Hawaii<br>425 Queen Street<br>Honolulu, HI 96813; | : |
| | : |
| **STATE OF ILLINOIS**<br>Office of the Attorney General<br>100 W. Randolph Street<br>Chicago, IL 60601; | : |
| | : |

**STATE OF INDIANA**
Office of the Attorney General
Indiana Government Center South
302 W. Washington Street, 5th Floor
Indianapolis, IN 46204;

**STATE OF MASSACHUSETTS**
Office of the Attorney General
Commonwealth of Massachusetts
One Ashburton Place, Room 1813
Boston, MA 02108;

**STATE OF MINNESOTA**
Office of the Minnesota Attorney General
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101;

**STATE OF MONTANA**
Office of Attorney General
Department of Justice
PO Box 201401
Helena, MT 59620-1401;

**STATE OF NEVADA**
Office of the Nevada Attorney General
100 North Carson Street
Carson City, NV 89701-4717;

**STATE OF NEW JERSEY**
Office of the Attorney General
Richard J. Hughes Justice Complex
8th Floor, West Wing
25 Market Street
Trenton, NJ 08625-0080;

**STATE OF NEW MEXICO**
New Mexico Attorney General's Office
PO Drawer 1508
Santa Fe, NM 87504-1508;

**STATE OF NEW YORK**                                       :
Office of the Attorney General                             :
Managing Clerk's Office                                     :
120 Broadway, 24th Floor                                    :
New York, New York 10271;                                   :
                                                            :
**STATE OF NORTH CAROLINA**                                :
Attorney General's Office                                   :
Legal Services Division                                     :
9001 Mail Service Center                                    :
Raleigh, NC 27699-9001;                                     :
                                                            :
**STATE OF RHODE ISLAND**                                  :
Office of the Attorney General                             :
150 S. Main Street                                          :
Providence, RI 02903;                                       :
                                                            :
**STATE OF TENNESSEE**                                     :
Office of the Attorney General and Reporter :
P.O. Box 20207                                              :
Nashville, TN 37202-0207;                                   :
                                                            :
**STATE OF VIRGINIA**                                      :
Office of the Attorney General                             :
900 E. Main Street                                          :
Richmond, VA 23219;                                         :
                                                            :
**DISTRICT OF COLUMBIA**                                   :
Corporation Counsel                                         :
Office of Attorney General                                  :
441 4th Street, NW                                          :
Washington, DC 20001;                                       :
                                                            :
**CITY OF CHICAGO**                                        :
Corporation Counsel                                         :
The Law Department - Chicago                                :
121 N. LaSalle Street, Suite 600                            :
Chicago, IL   60602;                                        :
                                                            :
**CITY OF NEW YORK**                                       :
New York City Department of Investigation :
80 Maiden Lane                                              :
New York, NY 10038;                                         :
                                                            :
                          Plaintiffs                        :

v.                                              :
                                                :
                                                :
**AT&T, INC.**                                  :
208 S. Akard Street                             :
Dallas, TX 75202;                               :
                                                :
**AT&T CORP.**                                  :
208 S. Akard Street                             :
Dallas, TX 75202;                               :
                                                :
**AT&T CORP., dba AT&T ADVANCED** :
**SOLUTIONS**                                   :
1010 North St. Mary's Street                    :
San Antonio, TX 78215;                          :
                                                :
**AT&T DATACOMM, INC., dba AT&T** :
**DATACOMM**                                    :
175 E. Houston Street, Room 8-H-60              :
San Antonio, TX 78205;                          :
                                                :
**AT&T MOBILITY**                               :
208 S. Akard Street                             :
Dallas, TX 75202;                               :
                                                :
**ALASCOM, INC., dba AT&T**                     :
**ALASCOM**                                     :
505 E. Bluff Drive                              :
Anchorage, AK 99501-1108;                       :
                                                :
**BELLSOUTH COMMUNICATIONS**     :
**SYSTEMS, LLC, dba AT&T**                      :
**COMMUNICATIONS SYSTEMS**                      :
**SOUTHEAST**                                   :
1936 Blue Hills Drive                           :
Roanoke, VA 24012;                              :
                                                :
**BELLSOUTH LONG DISTANCE, INC.,** :
**dba AT&T LONG DISTANCE**                      :
400 Perimeter Center Terrace, Suite 350         :
Atlanta, GA 30345;                              :
                                                :

**BELLSOUTH
TELECOMMUNICATIONS, INC.**
675 West Peachtree Street NW
Atlanta, GA 30375;

**ILLINOIS BELL TELEPHONE
COMPANY dba AT&T ILLINOIS**
225 West Randolph Street, Room 28B
Chicago, IL 60606;

**INDIANA BELL TELEPHONE
COMPANY, dba AT&T INDIANA**
240 North Meridian Street
Indianapolis, IN 46204;

**MICHIGAN BELL TELEPHONE
COMPANY, dba AT&T MICHIGAN**
444 Michigan Avenue
Detroit, MI 48226;

**NEVADA BELL TELEPHONE
COMPANY, dba AT&T NEVADA**
1450 Vassar Street 101
Reno, NV 89502-2718;

**THE OHIO BELL TELEPHONE
COMPANY, dba AT&T OHIO**
45 Erieview Plaza
Cleveland, OH 44114;

**PACIFIC BELL TELEPHONE
COMPANY, dba AT&T CALIFORNIA**
140 New Montgomery Street
San Francisco, CA 94105-3705;

**SBC LONG DISTANCE , LLC, dba
AT&T LONG DISTANCE**
6304 Highway 5
Douglasville, GA 30135;

**SBC INTERNET SERVICES, INC., dba
AT&T INTERNET SERVICES**
6000 Las Colinas Boulevard
Irving, TX 75039-4216;

**THE SOUTHERN NEW ENGLAND**                :
**TELEPHONE COMPANY, dba**                  :
**AT&T CONNECTICUT**                         :
5 W. Service Road                            :
Hartford, CT 06120-1501;                     :
                                             :
**SOUTHWESTERN BELL TELEPHONE**:
**COMPANY**                                  :
175 East Houston                             :
San Antonio, TX 78205-2233; and             :
                                             :
**WISCONSIN BELL, INC., dba AT&T**           :
**WISCONSIN**                                :
727 North Broadway                           :
Milwaukee, WI 53202,                         :
                                             :
                    Defendants.              :
                                             :

**FALSE CLAIMS ACT COMPLAINT**

Relator, Todd Heath, on behalf of plaintiffs the United States of America, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, and Virginia (collectively, the "States"), the District of Columbia ("D.C."), and the Cities of Chicago and New York (collectively, the "Cities"), and pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 and the False Claims Statutes and Ordinances of the States, D.C., and the Cities, brings this *qui tam* Complaint against Defendants, AT&T Inc. and certain of its wholly-owned subsidiaries.

## I. NATURE OF THE CASE

1. By the Telecommunications Act of 1996 (the "Act"), Congress attempted to bring real competition to the provision of telecommunications, internet access and related services in the United States, and to speed the introduction of advanced telecommunications services. As part and parcel of implementing this goal, the Act gave rise to the creation of the "Schools and Libraries Universal Service Support Mechanism," commonly referred to as the Education Rate ("E-Rate") Program, which provides significant federal subsidies for telecommunications, internet and related services to needy schools and libraries. The fund created by the Act for providing subsidies, the Universal Service Fund ("USF"), is administered by the Universal Service Administrative Company ("USAC"), overseen by the Federal Communications Commission ("FCC").

2. Since its 1997 creation, the E-Rate Program has been capped at $2.25 billion per

year. Given the Program's wide popularity with schools and libraries across the nation, and the high need levels of these recipients, "[r]equests for E-Rate funding consistently exceed the annual funding cap." *Telecommunications: Long Term Strategic Vision Would Help Ensure Targeting of E-Rate Funds to Highest-Priority Uses*, GAO-09-253, Washington, DC, March 27, 2009. Thus, to ensure that these scarce federal monies are spent appropriately and efficiently and that the available funds are stretched as far as possible, the Program depends on scrupulous adherence by all participants to Program rules. In this regard, none of the rules is more important than those governing competition and pricing of eligible services.

3.      One of the most important safeguards that the FCC enacted, in implementing the methods for providing subsidies to the schools and libraries from the USF, was a system to reduce the prices of the telecommunications services that the USF reimburses:

> [T]o achieve the goal of allowing schools and libraries to obtain telecommunications services at discounted rates, Congress designed a system by which common carriers, in the course of providing service to the public generally, are required to offer discounted rates to those eligible entities.

*In the Matter of Federal-State Joint Board on Universal Service*, FCC Docket No. 96-45, January 29, 1999 (Declaratory Order), 14 F.C.C.R. 3040, at 3043.

4.      Defendant AT&T Inc., through its many E-Rate participating entities, unlawfully and secretly has refused to abide by the Act's pricing proscriptions and routinely has failed to bid, offer and as a result invoice (*i.e.*, "charge") its E-Rate eligible services to schools and libraries in accordance with regulatory mandates. In the process, Defendant has subverted the Act's goals, unlawfully obtained funding commitments that never should have issued, mischarged and overcharged the schools, libraries and the United States. As a consequence, the

E-Rate fund improperly was drained, and as a further consequence the amount of federal support available to school districts and libraries improperly was reduced, to the ultimate detriment of the school children of the United States, especially those who attend the nation's poorest schools.

## II.    THE PARTIES

5.    Relator, Todd Heath ("Relator" or "Heath") is an adult resident and citizen of Wisconsin. At relevant times, Heath has been the owner of "The Telephone Company," a business through which Heath performs for-hire audits of the telecommunications records and bills of school districts and businesses. As a result of these audits, and the subsequent investigations conducted by his attorneys, Heath became aware of the fraudulent acts and practices described in this Complaint.

6.    Defendant AT&T Inc. formerly was known as Southwestern Bell Telephone Company, L.P. ("SBC"). On November 18, 2005, SBC Communications Inc. completed its acquisition of AT&T Corp. and adopted AT&T Inc. as its name.

7.    AT&T Inc. is a Delaware corporation with its headquarters and principal place of business at 208 South Akard Street, Dallas, Texas.

8.    AT&T Inc. operates through itself and through various wholly-owned and controlled subsidiaries acting on its behalf. Each such entity participating in the E-Rate Program (including AT&T Inc. itself) must obtain a Service Provider Identification Number from USAC, and is referred to in E-Rate parlance as a "SPIN." Each of the AT&T subsidiaries participating as SPINs in the E-Rate Program is a defendant herein.

9.    Defendant AT&T Mobility (SPIN 143025240) is a wholly-owned subsidiary of AT&T Inc., incorporated in Delaware with its principal offices in Dallas, Texas.

3

10. Defendant AT&T DataComm, Inc. dba AT&T DataComm (SPIN 143004812) is a wholly-owned subsidiary of AT&T Inc., incorporated in Delaware, with its principal offices in San Antonio, Texas.

11. Defendant AT&T Corp. (multiple dba's) (SPIN 143001192) is a wholly-owned subsidiary of AT&T Inc., incorporated in New York, with its principal offices located in Dallas, Texas.

12. Defendant Alascom, Inc. dba AT&T Alascom (SPIN 143005617) is a wholly-owned subsidiary of AT&T Inc., incorporated in Alaska with its principal offices in Anchorage, Alaska.

13. Defendant AT&T Corp. dba AT&T Advanced Solutions (SPIN 143022137) is a wholly-owned subsidiary of AT&T Inc., incorporated in New York with its principal executive offices in San Antonio, Texas.

14. Defendant BellSouth Long Distance, Inc. dba AT&T Long Distance (SPIN 143004066) is a wholly-owned subsidiary of AT&T Inc., incorporated in Delaware with its principal offices in Atlanta, Georgia.

15. Defendant BellSouth Communication Systems, LLC dba AT&T Communication Systems Southeast (SPIN 43011959) is a wholly-owned subsidiary of AT&T Inc., incorporated in Georgia with its principal offices in Roanoke, Virginia.

16. Defendant BellSouth Telecommunications, Inc. (SPIN 143004824) is a wholly-owned subsidiary of AT&T Inc., incorporated in Georgia with its principal offices in Atlanta, Georgia.

17. Defendant Illinois Bell Telephone Company dba AT&T Illinois (SPIN

4

143001912) is a wholly-owned subsidiary of AT&T Inc., incorporated in Illinois with its principal offices in Chicago, Illinois.

18.     Defendant Indiana Bell Telephone Company, Inc. dba AT&T Indiana (SPIN 143004642) is a wholly-owned subsidiary of AT&T Inc., incorporated in Indiana with its principal offices in Indianapolis, Indiana.

19.     Defendant Michigan Bell Telephone Company dba AT&T Michigan (SPIN 143001727) is a wholly-owned subsidiary of AT&T Inc., incorporated in Michigan with its principal offices in Detroit, Michigan.

20.     Defendant Nevada Bell Telephone Company dba AT&T Nevada (SPIN 143002679) is a wholly-owned subsidiary of AT&T Inc., incorporated in Nevada with its principal offices in Reno, Nevada.

21.     Defendant The Ohio Bell Telephone Company dba AT&T Ohio (SPIN 143001688) is a wholly-owned subsidiary of AT&T Inc., incorporated in Ohio with its principal offices in Cleveland, Ohio.

22.     Defendant Pacific Bell Telephone Company dba AT&T California (SPIN 143002665) is a wholly-owned subsidiary of AT&T Inc., incorporated in California with its principal offices in San Francisco, California.

23.     Defendant SBC Internet Services, Inc. dba AT&T Internet Services (SPIN 143004611) is a wholly-owned subsidiary of AT&T Inc., incorporated in California with its principal offices in Irving, Texas.

24.     Defendant SBC Long Distance, LLC dba AT&T Long Distance (SPIN 143008823) is a wholly-owned subsidiary of AT&T Inc., incorporated in Delaware with its

principal offices in Douglasville, Georgia.

25.     Defendant Southwestern Bell Telephone Company (SPIN 14300462) is a wholly-owned subsidiary of AT&T Inc., incorporated in Missouri with its principal offices in San Antonio, Texas.

26.     Defendant The Southern New England Telephone Company dba AT&T Connecticut (SPIN 143001305) is a wholly-owned subsidiary of AT&T Inc., incorporated in Connecticut with its principal offices in Hartford, Connecticut.

27.     Defendant Wisconsin Bell, Inc. dba AT&T Wisconsin (SPIN 143001856) is a wholly-owned subsidiary of AT&T Inc., incorporated in Wisconsin with its principal offices in Milwaukee, Wisconsin.  As set forth in ¶ 30 below, certain claims against Wisconsin Bell, Inc. are excluded from this action.

28.     AT&T Inc. completely controls the methods and terms of its SPINs' participation in the E-Rate Program, and in particular the SPINs' E-Rate billing, and for purposes of the allegations of this Complaint there are no differences between or among AT&T Inc. and the AT&T Inc. SPINs, except that certain of the SPINs were acquired or created by AT&T Inc. at different times relevant to this action.  Therefore, AT&T Inc. and the AT&T Inc. wholly-owned subsidiary defendants are referred to throughout this Complaint as "AT&T", the "Company", the "AT&T SPINs", or "Defendant."

III.    SOURCE AND SCOPE OF RELATOR'S ALLEGATIONS AND CLAIMS

29.     The information related in this Complaint is derived from the original and first-hand knowledge and information of Relator, supplemented by additional factual investigation by his counsel.  Prior to the filing of this Complaint, Relator, through his counsel, advised the

6

United States that he would be filing a complaint and apprised the United States of his allegations.

30.     Heath is also the Relator and original source of information in an earlier filed, and recently unsealed, action against an AT&T wholly-owned Wisconsin subsidiary, *United States ex rel. Heath v. Wisconsin Bell, Inc.*, United States District Court for the Eastern District of Wisconsin, No. 2:08-cv-00876-PJG (the "Wisconsin Action").  The claims for recovery set out in this Complaint specifically exclude all Wisconsin-only claims set out in the Wisconsin Action. Relator disclaims any recovery in this action to the extent such recovery would be duplicative of any recovery in the Wisconsin Action.

## IV.     JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 31 U.S.C. §§ 3732 (False Claims Act).

32.     In addition, this Court has jurisdiction under 31 U.S.C. § 3732(b) and under the doctrine of supplemental jurisdiction over the state law claims for recovery of funds pleaded on behalf of the States, D.C., and the Cities, as these claims arise out of the same transactions or occurrences as the False Claims Act claims.

33.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. §3732(a), because AT&T does business within this District and has done so at all times relevant to this Complaint.

34.     Venue is proper within the District of Columbia pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), and 31 U.S.C. § 3732(a), because Defendant can be found in, resides in, and/or transacts business in this District and because some of the violations, acts and practices

7

complained of occurred within this District.

## V.   FRAUDULENT CONCEALMENT -
## TOLLING OF STATUTE OF LIMITATIONS

35.   To cover up the scheme and actions described in this Complaint, Defendant took affirmative actions to conceal its wrongful reimbursement from and billing of the United States, the States, D.C. and the Cities, remained silent when required to speak and failed to disclose material facts despite its duty to do so under the terms of their contracts, the statutes, regulations and decrees governing its participation in the E-Rate Program, under the United States False Claims Act and under the similar statutes in the States, D.C., and the Cities.

36.   Because Defendant withheld and concealed all information about its fraudulent billing practices, the USAC, the States, D.C., and the Cities were prevented from discovering Defendant's malfeasance, despite an exercise of reasonable care and diligence.

37.   At all material times, Defendant had knowledge of its actions and of the facts giving rise to the claims asserted in this Complaint.

38.   At all material times, Defendant concealed material facts from USAC and the school districts and libraries by withholding information about AT&T's pricing and billing practices, continuing to represent and imply that it was pricing and billing school districts and the USF in compliance with the law and consistent with its affirmative representations, and failing to disclose the mis-pricing and overbilling of school districts and the USF, despite its obligation under law to do so.

39.   Prior to the filing of this Complaint, USAC, schools and libraries did not know of the facts surrounding Defendant's wrongful pricing and overbilling of the USF, schools and

8

libraries, and in the exercise of reasonable care and diligence could not have known of Defendant's unlawful conduct.

40.    Prior to the filing of this Complaint, no facts were known by USAC, schools and libraries sufficient to put USAC, schools and libraries on notice that each had suffered injuries as a result of Defendant's wrongful conduct.

## VI.    AGENCY ALLEGATIONS

41.    AT&T, its subsidiaries, employees and any others carrying out the scheme alleged in this Complaint (and each of them) were the agents, servants, employees, successors, assignees, transferees, and/or joint venturers of AT&T, and each was, as such, acting within the course, scope and authority of said agency, employment and/or joint venture and was acting with the consent, permission and authorization of AT&T.  AT&T ratified and approved all actions in furtherance of the scheme alleged in this Complaint by such agents, servants, employees, successors, assignees, transferees, and/or joint venturers.

## VII.    SUBSTANTIVE ALLEGATIONS

### A.    The Telecommunications Act of 1996 and the E-Rate Program

42.    Congress passed the Act to encourage "universal telecommunications service." Universal telecommunications service includes "advanced telecommunications and information services," including telecommunications services, internet access, internal connections and basic maintenance for internal connections for public schools, as well as for public libraries and urban and rural health care providers.

43.    In the Act, Congress required that telecommunications carriers and other providers, upon a *bona fide* request from elementary schools, secondary schools and libraries for

services included within the Act's definition of universal services, "provide such services . . . for educational purposes at rates less than the amounts charged for similar services to other parties." 47 U.S.C. § 254(h)(1)(B). The Act gives authority to the FCC and the States to determine the amount of the appropriate reduced rates. *Id.*

44. The Act further required the FCC to convene a Federal-State Joint Board ("Joint Board") to recommend changes to the FCC's existing universal support mechanisms. In particular, the Act directed the Joint Board to recommend, and the FCC to adopt, a new set of universal support rules and regulations to advance the universal service principles enumerated in the Act. 47 U.S.C. Sec. 254(a). Pursuant to this directive, the FCC created the Joint Board, which released its *Recommended Decision* on November 8, 1996. FCC Docket No. 96-45, November 8, 1996.

45. Thereafter, after further hearings, the FCC issued its final decision and order on May 8, 1997. *In the Matter of Federal-State Joint Board on Universal Service*, FCC Docket No. 96-45, May 8, 1997 ("Universal Service Order").

46. Among other things, the Universal Service Order implemented the E-Rate Program, administered by USAC under the direction of the FCC. The Universal Service Order established that schools and libraries, depending on their level of poverty and the urban/rural nature of the population the school or library serves, would receive substantial discounts from their bills for telecommunications, internet access and related internal connections and basic maintenance services, paid for as reimbursements from the USF.

**B.** **The Methodology for E-Rate Program Reimbursement**

47. The E-Rate Program established by the FCC provides schools and libraries with

discounts on telecommunications services, internet access, and data transmission wiring and components used for educational purposes. Based on prescribed indicators of need, eligible schools and libraries qualify for reimbursement of 20 percent to 90 percent of the cost of eligible services, provided they show that they can pay for the unreimbursed portion of the services. Before submitting an application to USAC for E-Rate Funding, the Program requires schools and libraries seeking funding ("Applicants") to complete several formal steps:

a.      **Applicant Prepares a Technology Plan**. The Applicant must conduct a technology assessment and develop a technology plan, approved by a recognized expert/consultant, ensuring that the services it obtains are eligible for funding and can be used effectively.

b.      **Requests for Bids are Posted**. Thereafter, the Applicant must identify the products and services it needs to implement the technology plan and submit a form (FCC Form 470) to USAC describing these products and services and requesting bids or proposals (the Applicant may also use a request for proposal to solicit bids). USAC posts the completed forms on its website, where service providers can view the requests and decide whether to bid. To be eligible to participate in the E-Rate Program, service providers must obtain a SPIN, and must certify compliance with Program rules each year that they participate in the Program. The bids themselves are only eligible for funding if the providers have calculated their "lowest corresponding price" ("LCP") -- the lowest price charged for the services to similarly situated customers -- and bid at no higher than LCP, and have complied with open bidding rules by avoiding discussion of the bids with the Applicants or other providers while the bids are open.

11

c.      **Applicant Selects a Service Provider and Enters into an Agreement.** At least 28 days after USAC posts the Applicant's Form 470 on USAC's website, the Applicant considers all bids, selects a service provider, enters into negotiations over an agreement for service, and enters into an agreement with a service provider for eligible services. Although Applicants may review a variety of factors in making a selection, E-Rate Program orders and regulations require that price be the primary factor the Applicant considers.

d.      **USAC Reviews the Request for Funding.** Once a contract is reached with a service provider, the Applicant submits its requests for funding to USAC on FCC Form 471. Form 471, which itemizes and allocates the services for which funding is sought, attaches the contract between the applicant and the service provider.

e.      **USAC Issues a Funding Commitment Decision Letter.** USAC then reviews the request for funding to determine whether applicants have complied with E-Rate Program rules and requirements (the "Program Integrity Review"). After this review, and assuming the submitted package is complete and otherwise in order, USAC renders a funding decision, which is communicated by a "Funding Commitment Decision Letter" ("FCDL") to the applicant and service provider. The FCDL states how much funding the Applicant may receive for eligible services provided within the particular funding year deadlines. The commitment reflected by the FCDL is conditional, based on the Applicant meeting certain additional requirements. The commitment may be for the full amount requested, less than the full amount requested, or funding may be denied entirely for reasons such as requests for ineligible services or other noncompliance with Program rules.

f.      **Funds are Issued by USAC.** If the FCDL entirely or partially approves the

12

request, service begins and the Applicant completes and files an FCC Form 486 with USAC. The Form 486 informs USAC that the Applicant is receiving, is scheduled to receive, or has received service in the relevant E-Rate Program funding year from the approved service provider. Receipt of a properly completed Form 486 by USAC triggers the process for USAC to receive and process invoices. Thereafter, the Applicant or the service provider submits invoices to USAC requesting reimbursement for the services that are planned to be or are being provided. Service providers may apply the Applicant's percentage discount rate (20% to 90%) to the Applicant's bill before sending it to the Applicant, in which case the Applicant pays only the nondiscounted portion and the service provider invoices USAC directly to obtain reimbursement. Alternatively, Applicants may pay for services in full and submit a form to USAC to request reimbursement. Whichever invoicing method is used, USAC reviews and disburses payments for universal service support to the service provider; under the latter invoicing method, the service provider then remits the reimbursed amount to the Applicant.

48.     E-Rate Program funding thus hinges on eligibility and compliance: the services for which funding is sought must be eligible for USF reimbursement under the Program requirements, the purposes for which the services were sought must also be eligible under the regulations, Program procedures must followed, and the participants themselves - the schools and libraries, and the service providers - must comply with all Program eligibility requirements.

49.     Any failure to comply with the eligibility requirements associated with these process steps can result in a USAC decision to deny funding. USAC's denial can occur in connection with the funding request, or it can occur post-funding commitment, depending on when the facts rendering the services ineligible occur and when USAC becomes aware of those

13

facts. When USAC learns of such facts post-funding, the FCC requires it to recoup the funds from the party "that committed the rule or statutory violation in question." *Order on Reconsideration and Fourth Report and Order*, July 23, 2004, 19 F.C.C.R. 15252, at ¶¶ 10-22.

### C.   Pricing Under the E-Rate Program

50.   In addition to the E-Rate Program's direct discount reimbursements of between 20% and 90% of schools' and libraries' eligible telecommunications expenses from the USF, Congress and the FCC have imposed substantial requirements to limit the "pre-discount" prices (*i.e.,* the baseline service prices being offered to the schools and libraries against which the 20-90% discount reimbursement is applied) that can be submitted for USF reimbursement in the first place.

51.   The reason that the FCC attempts to reduce pre-discount prices is obvious: given a fund whose annual cap of $2.25 billion is inadequate to fund the amounts requested, it is critical to try to spread the funds as broadly and efficiently as possible to meet the Program's goals and maximize its reach.

52.   Moreover, Congress and the FCC recognize that schools and libraries constitute a vulnerable class of purchasers due to their comparative lack of technological sophistication and lack of relevant bargaining experience, and that their incentive to engage in "hard bargaining" is reduced the more their percentage reimbursement is increased. For these reasons, the FCC sought to ensure that schools and libraries focused their purchasing decisions on cost-effectiveness, and particularly on the prices being offered by the service providers for eligible services. To that end, the Universal Service Order regulated the schools and libraries by directing them "that price should be the primary factor in selecting a bid." *Universal Service*

14

*Order*, ¶ 481.

53.    To the same end of reducing pre-discount prices, the FCC imposed the LCP mandate on service providers. The FCC specifically adopted the Joint Board's recommendation to protect the inexperienced schools and libraries (and thus the USF) by requiring that the service providers offer the E-Rate beneficiaries the LCP for all eligible telecommunications services:

> We concur . . . with the Joint Board that, to ensure that a lack of experience in negotiating in a competitive telecommunications service market does not prevent some schools and libraries from receiving such [competitive] offers, **we should require that a carrier offer services to eligible schools and libraries at prices no higher than the lowest price it charges to similarly situated non-residential customers for similar services (hereinafter the 'lowest corresponding price.').**

*Universal Service Order*, ¶ 484 (emphasis added).

54.    The FCC then clarified the scope of the LCP requirement it was enacting:

> We also adopt the Joint Board's recommendation to use **the lowest corresponding price as an upper limit on the price that carriers can charge schools and libraries in non-competitive markets, as well as competitive markets,** so that eligible schools and libraries can take advantage of any cost-based rates that other customers may have negotiated with carriers during a period when the market was subject to actual, or even potential, competition. We conclude that requiring providers to charge their lowest corresponding price would impose no unreasonable burden, even on non-dominant carriers, because all carriers would be able to receive a remunerative price for their services. We clarify that, **for purposes of determining the lowest corresponding price, similar services would include those provided under contract as well as those provided under tariff.**

*Universal Service Order*, ¶ 485 (emphasis added).

55.    Further, the FCC determined that providers should not be prevented from offering

15

services below their tariffed prices (where applicable) to eligible schools and libraries. The

Universal Service Order therefore expressly exempted schools and libraries eligible for E-Rate

services from the nondiscrimination requirement of Section 202(a) of the Act, allowing service

providers otherwise subject to that requirement to offer E-Rate program services to schools and

libraries at **preferential** rates to those in their tariffed offerings. *Universal Service Order*, ¶ 483.

56.    The Universal Service Order further highlighted the centrality of the LCP

requirement by ordering that LCP compliance be included within service providers' Program

compliance certifications:

> Moreover, we agree with the Joint Board's recommendation that,
> **as a condition of receiving support, carriers be required to
> certify that the price they offer to schools and libraries is no
> greater than the lowest corresponding price** based on the prices
> the carrier previously charged or is currently charging in the
> market. This obligation would extend, for example, to competitive
> LECs, wireless carriers, or cable companies, to the extent that they
> offer telecommunications for a fee to the public. We share the
> Joint Board's conclusion **that Congress intended schools and
> libraries to receive the services they need from the most
> efficient provider of those services.**

*Universal Service Order*, ¶ 488 (emphasis added).

57.    The LCP requirement was no surprise to the service providers, nor was the E-Rate

Program's requirement that carriers affirmatively consider, calculate, analyze and determine LCP

**before** bidding on E-Rate opportunities. The Act set out a reduced pricing regime, and the Joint

Board had recommended that this directive be implemented by requiring LCP. Indeed, in the

proceedings leading up to the adoption of the Universal Service Order by the FCC, the largest

carriers, which had the greatest stake in the E-Rate Program, actively lobbied the FCC for

particular features to be incorporated into the LCP requirement. For instance, certain carriers,

16

including SBC, Ameritech and BellSouth, all of which are now part of AT&T, met *ex parte* with FCC representatives in March 1997 to lobby the carriers' views on several issues concerning the FCC's implementation of the E-Rate Program, including LCP, and the carriers followed up this meeting with a letter to the FCC dated April 3, 1997. The first point of the carriers' letter related to the contours of the LCP requirement, and the letter summarized the carriers' request that "[t]he Commission **should allow carriers to determine LCP – the pre-discount price** – based on a **consideration of factors normally used in determining prices** within a competitive market." *Ex Parte* Letter from SBC, Ameritech, BellSouth, GTE and US West to Regina Keeney, Chief Officer, FCC's Common Carrier Bureau, dated April 3, 1997, p. 1 (emphasis added)(attached as Exhibit 1). Moreover, the carriers proposed that the FCC adopt the following language as part of its LCP rules:

> **In determining the LCP, carriers may consider** factors normally relied upon in **determining prices** within a competitive market. A **carrier shall not be required to set the LCP** based on prices it charges to other users if those prices are based on materially different factors, such as contract terms, volume, distance, geography, types of service, or other cost-affecting factors, from the terms, volume, distance coverage, geographic coverage, or type of service desired by an eligible school or library.

*Id.,* at p. 2 (emphasis added).

58.     The carriers also asked the FCC to clarify that certain short-term promotional offerings would be excluded from LCP, and to specify that other schools would be excluded from the calculation of LCP, proposing the following language:

> **In determining the LCP, carriers shall consider** only prices for similar services offered under similar circumstances to similarly situated non-residential customers that are not eligible schools or libraries. In addition, **when determining the LCP carriers may,**

17

> **but are not required to, take into account prices** offered during short-term, special pricing events such as promotional offerings or one-time regulatory actions.

*Id.* (emphasis added).

59.     Ultimately, the FCC adopted **all** of these proposals by the carriers when it adopted the final E-Rate Program rules. *Universal Service Order*, ¶¶ 488 (prices to other schools can be excluded from providers' LCP calculation) and 489 (allowing providers to use cost-affecting factors, as recognized by state public service commissions, in determining LCP); 47 C.F.R. § 54.511(b) (excluding from consideration of LCP promotional rates for a period of less than 90 days).

60.     Eight months after the release of the Universal Service Order, the FCC responded to additional issues raised by the carriers concerning the contours of the LCP requirement. *Fourth Order on Reconsideration in CC Docket No. 96-45, Report and Order in CC Docket Nos. 96-45, 96-262, 94-1, 91-213, 95-72* ("Fourth Order on Reconsideration"), FCC 97-420 (December 30, 1997), at ¶¶ 133-144. Specifically, the carriers challenged the Universal Service Order's three-year "look back" provision, which requires service providers to include rates offered over the previous three years when calculating their LCP. The FCC rejected the carriers' various reasons for eliminating the three-year rule; *id.*, at ¶¶ 139-140, but agreed that it needed to modify the Universal Service Order "to clarify the application of our lowest corresponding price requirement." *Id.*, at ¶ 141. The FCC determined that a service provider, "for purposes of calculating the lowest corresponding price, ... will not be required to match a price it offered to a customer under a special regulatory subsidy or that appeared in a contract negotiated under very different conditions." *Id.* The FCC went on to reject other modifications requested by the

18

carriers. *Id.*, at ¶¶ 143-144.

**D.     AT&T Ignores the LCP Requirement**

61.     Given the centrality of the LCP requirement and the carriers' (including AT&T's) substantial role in shaping the contours of the LCP rule eventually adopted by the FCC, AT&T's response to the LCP requirement is shocking: it simply ignored the rule in its entirety and refused to implement it.  When the E-Rate Program began in 1997, AT&T did nothing to institutionalize LCP compliance.  In August 1998, after the E-Rate Program had been in operation for a little over a year, the FCC issued another Order "clarify[ing] the application of the Commission's 'lowest corresponding price' requirement," *In the Matter of Federal-State Joint Board on Universal Service*, FCC Docket No. 96-45, August 7, 1998 (Order), 13 F.C.C.R. 14081. Nevertheless, AT&T continued to act as though the rule did not exist, and over the ensuing years, AT&T took no action whatsoever to comply with the E-Rate Program's LCP requirement, to the point that non-consideration of LCP became the ingrained practice.

62.     Indeed, **until sometime in 2009, AT&T never even created a method to determine what the LCP was,** let alone ensure that it offered LCP, as required, to schools and libraries.  In other words, for the first 12 years of the E-Rate Program, despite the clear requirements of E-Rate rules and regulations, AT&T never once calculated and offered LCP to a school or library.

**E.     AT&T's Past Abuses of the E-Rate Program**

63.     Although its other abuses of the E-Rate Program pale in comparison to its LCP violations, at least in terms of dollar amounts, AT&T is a recidivist E-Rate Program violator. AT&T previously has been investigated on multiple occasions for other significant violations of

19

the E-Rate Program, and has paid substantial fines and penalties as a result. One such investigation is particularly noteworthy because it was resolved by a consent decree in which AT&T paid fines and was ordered to comply with E-Rate Program billing requirements, yet, incredibly, even in the face of this consent decree, AT&T continued to violate E-Rate billing requirements by disregarding its obligation to offer LCP.

64.    This particular investigation concerned fraudulent E-Rate billing for services provided by AT&T to the New London, Connecticut, Public School District. To resolve this investigation, AT&T (then known as SBC) and its subsidiaries entered into a Consent Decree before the FCC. *In the Matter of SBC Communications, Inc.*, FCC File No. EB-04-IH-0342 (December 16, 2004) (Consent Decree attached as Exhibit 2).

65.    Although the investigation concerned New London Public Schools, it revealed systemic problems at AT&T (then known as SBC), and the Consent Decree required AT&T to set up a wide-ranging E-Rate Compliance Training Program, as follows:

> **Compliance Training Program.** SBC shall establish and maintain an E-Rate compliance training program for its wholly-owned subsidiaries' employees responsible for sales, account management, and project management relating to E-Rate contracts and services. This program will include at least the following elements:
>
> i.  SBC shall maintain a training package regarding E-Rate program requirements for its wholly-owned  subsidiaries' employees responsible for sales, account management, and project management relating to E-Rate contracts and services. **This package shall cover the following subject matter areas: eligible services, competitive bidding, the application process, service provider roles and responsibilities, discounts, the prohibition against free services, service substitutions and equipment transfers, billing SLD [ the Schools and Libraries division of USAC] for services, and document retention requirements.** The training package **shall also include a section on the potential ramifications of failing to**

20

**comply with the E-Rate rules, and a section reminding employees that they are responsible for knowing their obligations under the SBC Code of Business Conduct, which requires employees to comply with all applicable legal and regulatory requirements.** The training package shall also remind employees that they are responsible for maintaining the highest level of honesty and integrity, and notifying management if they learn of or suspect that any employee has engaged in any illegal or unethical business conduct related to the E-Rate program.

ii. SBC shall provide **E-Rate training sessions**, at least annually, utilizing the foregoing training package for its wholly-owned subsidiaries' **employees responsible for sales, account management, and project management relating to E-Rate contracts and services.** SBC also will provide the training package to new employees of its wholly-owned subsidiaries that are responsible for sales, account management, and project management functions relating to E-Rate contracts and services within 45 days of being assigned such responsibilities.

iii. **SBC shall update and enhance the foregoing training package regarding the E-Rate rules as appropriate and necessary to reflect the current FCC rules.** (emphasis added).

66.     The Consent Decree also required AT&T to designate "Regional E-Rate Coordinators," who would be responsible for answering day-to-day questions of employees and for escalating violations to the appropriate levels of the Company (*e.g.*, to the attention of the Legal Department).

67.     The Consent Decree further required AT&T to establish an "E-Rate Oversight Team":

**E-Rate Oversight Team.** SBC shall establish and maintain an E-Rate Oversight Team to provide training and act as a resource for SBC's business units regarding the rules and requirements of the E-Rate Program.    The E-Rate Oversight Team shall include representatives of SBC's Regulatory Planning and Policy Group, Regulatory Compliance Group, and Legal Department. The E-Rate Oversight Team will:

21

i. act as the central point of contact for documentation and dissemination of E-Rate Program requirements throughout the company;

ii. monitor changes in the federal E-Rate rules and regulations and ensure that those changes are documented and disseminated appropriately;

iii. develop and coordinate dissemination of E-Rate training materials;

iv. serve as a centralized resource for **resolving questions and problems relating to SBC's compliance with applicable E-Rate Program rules and regulations**; and

v. **work with SBC's Regional E-Rate Coordinators to ensure consistent implementation of the E-Rate rules and regulations across the company.**

68. The Consent Decree also required:

**D. E-Rate Oversight Team Subcommittees.** The E-Rate Oversight Team shall establish and maintain inter-disciplinary E-Rate subcommittees, which will be charged with the following responsibilities:

i. Program Requirements Subcommittee: **Outlining E-Rate Program requirements and mapping each to the appropriate organizations and business functions;**

ii. Training Subcommittee: **Developing and delivering E-Rate training and updating training material**, as needed, to reflect program changes;

iii. Marketing and Communications Subcommittee: Maintaining the SBC customer and employee E-Rate websites to serve as repositories for E-Rate reference materials;

iv. Billing and collections/IT/Invoicing/Accounting Subcommittee: Developing consistent methods of operations for SLD invoicing, tracking and monitoring SLC receivables, account reconciliation, and collections;

22

v. Process Standardization Subcommittee:
**Developing consistent methods and procedure for sales, customer invoicing, SLD escalations, document retention and other issues that might arise.** (emphasis added).

69.     In sum, the Consent Decree required a plenary overhaul of AT&T's E-Rate billing practices, E-Rate training, and most particularly its E-Rate Program legal compliance. Indeed, as a result of the Consent Decree and the investigation that led to it, AT&T actually did establish an E-Rate training and compliance program. Beginning with the E-Rate Program's 2005 Funding year (July 1, 2005 - June 30, 2006), AT&T required employees to participate in E-Rate training and pass a test demonstrating competence in the training materials. AT&T created a training manual, and set up the various coordinators and committees called for in the Consent Decree.

70.     True to form, despite the comprehensive, newly-created AT&T E-Rate training materials, AT&T again omitted **any** discussion of, or reference to, the E-Rate provider **pricing requirements**. The materials fail to even mention LCP, let alone instruct that it is a fundamental requirement of the E-Rate Program that schools and libraries be offered LCP. A copy of an AT&T E-Rate Training Manual dated September 2007 is attached as Exhibit 3, and training materials from an AT&T March 2008 E-Rate training conference are attached as Exhibit 4.

71.     As a result of AT&T's total failure to comply with the requirements of the Consent Decree in this respect, AT&T employees conducting E-Rate business thus continued to ignore the Company's responsibility to offer LCP to schools and libraries, and AT&T continued in its unlawful failure to offer schools and libraries LCP. As a result of this upstream, core pricing failure, funding requests continued to be made to and approved by USAC that should not have been made and should not have been approved, and AT&T continued its unlawful billing of

23

the USF, the States, D.C., and the Cities for misapproved, ineligible universal service telecommunications services.

72.     Shortly after AT&T entered into the Consent Decree, another false claims action was filed against it (through its wholly-owned subsidiary, AT&T Missouri) as a result of violations of the competitive bidding process, requests for approval of ineligible services, submitting false information and other unlawful acts in connection with services provided to the Kansas City, Missouri, School District.  Eventually, in 2009, AT&T resolved this action by paying $1.4 million.

73.     Then, while the Consent Decree still was in effect, AT&T became aware of an investigation into its E-Rate Program services in Indiana.  In this investigation, the government uncovered substantial evidence that an AT&T wholly-owned subsidiary, AT&T Technical Services Corp., had overbilled the SLD for telecommunications services under the E-Rate Program, including direct evidence of failure to comply with LCP, in addition to a significant number of other unlawful practices.  As a result of the Indiana investigation, AT&T ultimately paid over $8.2 million to resolve the federal government's allegations.

74.     Around the same time, AT&T realized that the FCC had begun to inquire about its E-Rate billing practices in Wisconsin, particularly its failure to offer LCP.  These inquiries, in fact, were the a result of the Wisconsin Action referenced in Paragraph 30 above.

75.     As a result of the Connecticut, Missouri, and Indiana investigations, and the inquiries resulting from the Wisconsin Action, AT&T realized that many of its E-Rate Program practices would subject it to the risk of continued government investigations and substantial sanctions, and possible criminal liability.

24

76.     Among other changes it made as a result of the investigations, AT&T completely revamped its E-Rate Program pricing and billing, with an eye toward avoiding the huge liability it had accrued by its previous unlawful E-Rate pricing and billing.  It created a pricing and billing template, which includes a matrix of questions that allow the determination of LCP for any given school district or library (known as "applicants" in E-Rate Program parlance), and allowed AT&T to comply with its LCP obligations for the first time since the inception of the E-Rate Program in 1997.  This new pricing and billing regime was introduced in 2009.

77.     Around the same time, AT&T revamped its E-Rate training program and training materials, so that these now include information and instruction on the LCP requirements.

78.     At the same time, AT&T was now forced to confront and examine the full extent of its historical failure to comply with its LCP obligations and resulting funds unlawfully obtained from the USF.  Despite a clear responsibility to provide this information to the government, AT&T instead decided to conceal this information, presumably hoping to avail itself of applicable statutes of limitations.

79.     By 2009, at a minimum, AT&T knew the full extent of its past wrongdoing throughout the nation in connection with its E-Rate billing.  AT&T at this point had a clear duty to present this information about its past unlawful billing practices to the government.  Nevertheless, AT&T decided to withhold this information, despite its obligation to furnish such information to the officials of the United States, the States, D.C., and the Cities responsible for administering the E-Rate Program and school and library billing, and investigating such wrongdoing, as well as enforcing the AT&T Consent Decree.

80.     Moreover, despite its obligation to provide such information to the government,

25

AT&T has continued to withhold information about its nationwide unlawful pricing and billing practices, presumably because it fears that potential revelations of its price misconduct involving vulnerable schools and libraries across the nation will poison the atmosphere for its proposed acquisition of T-Mobile USA.

**F.     AT&T's Express False Certifications**

81.     As set forth in ¶ 56 above, the Universal Service Order required service providers, as a condition of eligibility for E-Rate support, to certify that the prices they offer to schools and libraries are LCP.

82.     **FCC Form 473** is the E-Rate Program's "Service Provider Annual Certification Form" (referred to in E-Rate terminology as a "SPAC"), which every service provider (*i.e.*, every AT&T SPIN) must fill out annually.

> The Form 473 must be completed by each service provider, for each separate service provider Identification Number (SPIN), **to confirm that the invoice forms submitted by each service provider are in compliance with the FCC's rules governing the schools and libraries universal support mechanism** ("Program").

Instructions for FCC Form 473, p. 1 (emphasis added).

83.     Additionally, service providers must fill out FCC **Form 474** ("Service Provider Invoice Form," or "SPIF") with each invoice they submit. Form 474 notes that, as a prerequisite to any Form 474 request, a SPAC certification of compliance with E-Rate rules must be on file:

> **Service Provider Annual Certification Form**
>
> The FCC Form 473, Service Provider Annual Certification Form, is used by the service provider and **confirms that the service provider's invoice forms are completed in compliance with FCC rules governing the schools and libraries Universal Service support mechanism.** The Form 473 must be completed and submitted by the service provider prior to the service provider submitting its first

26

invoice to USAC. No invoices will be paid without a Form 473 filed for the pertinent year. If you have not done so already, please be sure to complete and submit the Form 473.

Instructions to Form 474, p. 2 (emphasis added).

84.    Each AT&T SPIN executed Forms 473 for every year from 1997-2009, and each separate request for E-Rate reimbursement that any of them submitted included an executed Form 474.

85.    In every Form 473, each AT&T SPIN certified that its invoice forms submitted to USAC:

contain requests for Universal Service support for services which have been billed to the service customers on behalf of schools, libraries, and consortia of those entities, as deemed eligible for Universal Support by the fund administrator.

Form 473, line 10 (emphasis added).

86.    The AT&T SPINs further certified that their invoices:

are based on bills or invoices issued by the service provider to the service provider's customers on behalf of schools, libraries and consortia of those entities, as deemed eligible for Universal Service support by the fund administrator.

Form 473, line 11 (emphasis added).

87.    Each and every Form 473 submitted between 1997 and 2009 by an AT&T SPIN was false.

88.    Each and every Form 473 submitted between 1997 and 2009 by an AT&T SPIN violated the False Claims Act.

89.    Each and every Form 473 submitted between 1997 and 2009 by an AT&T SPIN subjected AT&T, and the individual signers, to False Claim Act liability.

90.    In addition, each and every Form 473 submitted between 1997-2009 by an AT&T

27

SPIN, and by the individual signers (1) covered up AT&T's scheme; (2) contained false, fictitious or fraudulent statements or representations; and (3) made use of a false writing, all in violation of 18 U.S.C. § 1001.

91.    Likewise, E-Rate Program recipients must execute and file two forms. Each school and library participating in the E-Rate Program must execute and file **FCC Form 471,** which requests discounts from the SLD on eligible services to be provided to eligible schools and libraries. In it, the signer must certify compliance with bidding requirements, including that the most cost-effective service was selected (Line 27), that all competitive bidding requirements have been complied with (Line 28), and that the school or library has "complied with all program rules." (Line 30).

92.    **FCC Form 472**, the "Billed Entity Applicant Reimbursement Form" (known as a "BEAR"), is the form used to invoice USAC for E-Rate discounts on a retroactive basis (when the service provider does not discount applicant bills directly). **Form 472 is jointly submitted by the applicant and the service provider**. On it, the school or library must certify that the amounts listed on the BEAR "represent charges for eligible services delivered to and used by eligible schools, libraries . . ." FCC Form 472, Block 3, Section A. The service provider must sign the Form 472 in Block 4.

93.    The Forms 471 submitted by AT&T's customers from 1997 to 2009, and the Forms 472 jointly submitted by AT&T and AT&T's customers from 1997 to 2009 were invalid, and false, because of AT&T's failure to offer LCP during that time period. AT&T's noncompliance constituted a major Program violation disqualifying the services from funding eligibility, and the certifications of compliance with Program rules for procurement, pricing, and

28

eligibility of services were false, inasmuch as they were premised on the legitimacy of AT&T's offers. On the part of the schools and libraries, of course, these false certifications were inadvertent, as they were the victims of AT&T's misconduct, not the perpetrators. However, AT&T was fully aware of E-Rate Program rules, fully familiar with Form 471 and a joint submitter of Form 472, fully aware that the schools' and libraries' certifications were false, and fully aware that USAC relied on these certifications as a condition of payment. AT&T caused, jointly submitted (in the case of the Forms 472), benefitted from, and is responsible for the schools' and libraries' false certifications.

94.    AT&T's causing, and using, the false certifications by the schools and libraries on FCC Form 471 violated the False Claims Act. AT&T's joint submission of FCC Form 472, and its causing, and using, the false certifications by the schools and libraries on FCC Form 472, violated the False Claims Act.

**G.    AT&T's Implied False Certifications**

95.    At all times since 1997, LCP has been an express requirement of the E-Rate Program.

96.    Compliance with LCP is a material condition for reimbursement under the E-Rate Program.

97.    As set forth above, AT&T did not comply with LCP until 2009, and at all times before 2009 it withheld information from USAC, the school districts and libraries about its noncompliance with the LCP requirement.

98.    Further, since 2009, despite its enhanced awareness of the extent of its past violations of the LCP rule, AT&T has withheld and continues to withhold from USAC, the

29

schools and libraries all information about its past noncompliance with LCP.

99.     If USAC had known about AT&T's noncompliance with LCP, it would have deemed all requests for reimbursement for AT&T's services ineligible, and would not have issued payments on invoices submitted by AT&T, or by the schools and libraries, for E-Rate Program services provided by AT&T.

100.    If at any time since 2009 USAC had learned the extent of AT&T's past violations of the LCP rule, it would have sought to recoup funds provided to AT&T from 1997 to 2009.

101.    AT&T knew that LCP was an express requirement of the E-Rate Program and that compliance with the LCP was a material condition for reimbursement from the USF. AT&T knew that if USAC were made aware of the facts of AT&T's noncompliance with LCP, USAC would withhold payment for such services.

## VIII.    DAMAGES

102.    Because AT&T never calculated LCP, and all information about AT&T's pricing is entirely within AT&T's control, Relator cannot posit a damages estimate. However, given that most, if not all, of AT&T's submissions over a 12-year period were unlawful, Relator alleges that damages to the United States are, at least, in the hundreds of millions of dollars.

103.    The Detroit Public Schools ("DPS") offer a concrete example of the effect of AT&T's unlawful pricing scheme. In early 2010, DPS commissioned an audit of AT&T's E-Rate billings to DPS over the preceding five years. This audit showed, among other things, that over that five-year period AT&T was not offering or billing its services at LCP, and was billing DPS at a high, non-LCP tariff rate (in fact, although DPS had no way of knowing this, AT&T had only recently begun to even calculate LCP).

30

104.   The DPS audit concluded that, largely as a result of AT&T's failure to bill at LCP, DPS had been overcharged over the five-year period by at least $2.8 million.  This number represents only the margin between a lower tariff selected by the DPS auditor, and the higher tariff charged, and thus almost certainly understates any overcharges, because DPS' auditors would have no way of knowing what AT&T's actual LCP was at any given time.

105.   DPS is a large, poor urban school district, and it qualifies for E-Rate reimbursement at the 90% level, so most of those ineligible billings and overcharges were paid for by the USF.  DPS' current enrollment of nearly 100,000 students (per the DPS website) makes it approximately only the 25th largest school district in the United States.  This simple fact makes obvious the enormity of the AT&T's nationwide overcharges.

## COUNT I
### United States False Claims Act

106.   Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

107.   From 1997 through the present, AT&T knowingly made or used, or caused to be made or used, false statements including, but not limited to, false representations, material omissions, and/or false certifications relating to prices charged under the E-Rate Program, and its compliance with Program requirements as a condition of eligibility to participate, in order to cause false or fraudulent claims to be presented to and paid from the USF, in violation of the United States False Claims Act.  Defendant has knowingly and willfully violated the False Claims Act by submitting, and causing the submission of, false claims, and accepting payment pursuant to those false claims.

31

108.   Defendant knowingly has caused school districts and libraries to submit false claims for payment to USAC, knowing that such false claims would be submitted to USAC for reimbursement, and knowing that such school districts and libraries were unaware that they were submitting claims for reimbursement with prices that violated the rules of the E-Rate Program. By virtue of the acts alleged herein, Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, in violation of the False Claims Act, including 31 U.S.C. § 3729(a)(1)(A) and (B).

109.   Compliance with E-Rate Program rules and regulations, including LCP, is an express condition of eligibility for reimbursement by the USF.  If it were not for AT&T's certifications of compliance, both express and implied, USAC would not have issued E-Rate reimbursement payments to AT&T or the schools and libraries to which it provided telecommunications services.

110.   In addition, Defendant violated and continues to violate 31 U.S.C. § 3729(a)(1)(G), because it knowingly has concealed and knowingly and improperly avoided or decreased its obligation to pay or transmit money to the USF.  As is set forth in this Complaint, Defendant knowingly has failed to comply with its statutory obligation to offer its telecommunications services at specifically determined LCP to school districts and libraries since the inception of the E-Rate Program in 1997, and it has concealed the fact that it failed to comply with this obligation.  Moreover, at various times over the past ten years, AT&T's wrongdoing was highlighted, or in the exercise of reasonable diligence should have been apparent to AT&T management and compliance personnel, as the result of internal company investigations triggered by inquiries from or proceedings instigated by the FCC, Department of Justice or by States, as for

32

example in the Connecticut and Indiana matters discussed at ¶¶64-74 above. Although AT&T in these instances took certain actions to prevent liability from occurring in the future, it decided to continue to conceal its **past** wrongdoing **throughout the nation** despite its clear obligation to furnish such information to the officials responsible for investigating such wrongdoing, in violation of the United States False Claims Act.

111.   The United States is entitled to three times the amount by which it has been damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim presented or caused to be presented. Defendant has been aware of its failure to calculate LCP and the other wrongdoing alleged herein since the inception of the E-Rate Program in 1997. Defendant is not entitled to the benefit of any of the reduced damages provisions of 31 U.S.C. § 3729(a)(2), because it did not provide the United States with information promptly or otherwise, upon discovering the violations. To the contrary, AT&T actively has withheld such information since the inception of the E-Rate Program.

112.   USAC, unaware of the foregoing circumstances and conduct of Defendant, approved ineligible transactions and funding requests for schools and libraries throughout the nation and subsequently paid claims to Defendant and its customers out of the USF that were ineligible and either should not have been paid at all, or should only have been paid at lesser amounts than those sought. By reason of these payments, the USF has been damaged in an undetermined amount.

WHEREFORE, Relator respectfully requests that this Court enter judgment against Defendant, as follows:

(a)   That the United States be awarded damages in the amount of each and every false

33

or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus civil penalties and statutory damages to the maximum extent allowed under the False Claims Act;

(b)      That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator's counsel necessarily incurred in bringing and pressing this case;

(c)      That Relator be awarded the maximum amount allowed pursuant to the False Claims Act; and

(D)      That the United States be granted such other and further relief as the Court deems just and proper.

## COUNT II
### California False Claims Act

113.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

114.    This is a *qui tam* action brought by Relator on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650, *et seq.*

115.    Cal. Gov't Code § 12651(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3) conspires to commit a violation of this subdivision;

. . .

(8) is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

116.    Defendant further violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of California by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

117.    The State of California, by and through school districts statewide, and unaware of Defendant's conduct, paid for telecommunications services at the inflated rates charged by Defendant.

118.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of California in connection with Defendant's conduct.  Compliance with applicable California statutes and regulations was also an express condition of payment of claims submitted to the school districts.

119.    Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the applicable E-Rate rules and regulations, particularly LCP, or were premised on false and/or misleading information, the school districts would not have paid the claims submitted by Defendant.

120.    As a result of Defendant's violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

121.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to Cal. Gov't Code § 12652(c)

35

on behalf of himself and the State of California.

122.   This Court is requested to accept supplemental jurisdiction over this related state claim, as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of the E-Rate Program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF CALIFORNIA:

      (1)    Three times the amount of actual damages which the State of California, through the school districts, has sustained as a result of Defendant's conduct;

      (2)    A civil penalty of up to $10,000 for each false claim which Defendant presented or caused to be presented to the school districts;

      (3)    Prejudgment interest; and

      (4)    All costs incurred in bringing this action.

To Relator:

      (1)    The maximum amount allowed pursuant to Cal. Gov't Code § 12652(g) and/or any other applicable provision of law;

      (2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

      (3)    An award of reasonable attorneys' fees and costs; and

      (4)    Such further relief as this Court deems equitable and just.

## COUNT III
### Delaware False Claims Act

123.   Relator realleges and incorporates by reference the prior paragraphs as though

fully set forth herein.

124. This is a *qui tam* action brought by Relator on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Title 6, Chapter 12 of the Delaware Code. 6 Del. C. § 1201(a), which provides liability for any person who:

> (1) knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; or

> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

125. Defendant further violated 6 Del. C. § 1201(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Delaware by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

126. The State of Delaware, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

127. Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of Delaware in connection with Defendant's conduct. Compliance with applicable Delaware statutes and regulations was also an express condition of payment of claims submitted to the school districts.

128. Had the school districts known that Defendant was violating the federal and state

laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

129. As a result of Defendant's violations of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount in excess of millions of dollars exclusive of interest.

130. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware.

131. This Court is requested to accept supplemental jurisdiction of this related state claim, as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Delaware school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF DELAWARE:

    (1)    Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Delaware;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relator:

    (1)    The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;

38

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT IV
### Florida False Claims Act

132.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

133.    This is a *qui tam* action brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*

134.    Fla. Stat. § 68.082(2) provides liability for any person who:

(a)    knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c)    conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

135.    Defendant further violated Fla. Stat. § 68.082(2) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Florida by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

136.    The State of Florida, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

137.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of Florida in connection with Defendant's conduct. Compliance with applicable Florida statutes and regulations was also an express condition of payment of claims submitted to the school districts.

138.    Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

139.    As a result of Defendant's violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount in excess of millions of dollars, exclusive of interest.

140.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to Fla. Stat. § 68.083(2)-(7) on behalf of himself and the State of Florida.

141.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Florida school districts.

WHEREFORE, Relator respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF FLORIDA:

(1)     Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's conduct;

40

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Florida;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT V
### Hawaii False Claims Act

142.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

143.    This is a *qui tam* action brought by Relator on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21, *et seq.*

144.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or d by the state;

(3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

41

. . .

> (8) is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

145. Defendant further violated Haw. Rev. Stat. § 661-21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Hawaii by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

146. The State of Hawaii, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

147. Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of Hawaii in connection with Defendant's conduct. Compliance with applicable Hawaii statutes and regulations was also an express condition of payment of claims submitted to the school districts.

148. Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

149. As a result of Defendant's violations of Haw. Rev. Stat. § 661-21(a), the State of Hawaii has been damaged in an amount in excess of millions of dollars, exclusive of interest.

150. Relator is a private citizen with direct and independent knowledge of the

42

allegations of this Complaint, and has brought this action pursuant to Haw. Rev. Stat. § 661-25 on behalf of himself and the State of Hawaii.

151.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Hawaii school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF HAWAII:

(1)    Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendant's illegal conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Hawaii;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

152.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

## COUNT VI
### Illinois False Claims Act

153.    This is a *qui tam* action brought by Relator on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175, *et seq.*

154.    740 ILCS 175/3(a)(1) provides liability for any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G).

155.    Defendant further violated 740 ILCS 175/3(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Illinois by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

156.    The State of Illinois, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

157.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of Illinois in connection with Defendant's conduct. Compliance with applicable Illinois statutes and regulations was also an express condition of payment of claims submitted to the school districts.

158.    Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed

44

to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

159.   As a result of Defendant's violations of 740 ILCS 175/3(a)(1), the State of Illinois has been damaged in an amount in excess of millions of dollars, exclusive of interest.

160.   Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to 740 ILCS 175/4(b) on behalf of himself and the State of Illinois

161.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Illinois school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF ILLINOIS:

>   (1)   Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's conduct;
>
>   (2)   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Illinois;
>
>   (3)   Prejudgment interest; and
>
>   (4)   All costs incurred in bringing this action.

To Relator:

>   (1)   The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;
>
>   (2)   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

45

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT VII
### Indiana False Claims and Whistleblower Protection Act

162.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

163.    This is a *qui tam* action brought by Relator on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5, *et seq.*

164.    Indiana Code 5-11-5.5-2 imposes liability on:

(b) A person who knowingly or intentionally:

> (1) presents a false claim to the state for payment or approval;
>
> (2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;
>
> . . .
>
> (7) conspires with another person to perform an act described in subdivisions (1) through (6); or
>
> (8) causes or induces another person to perform an act described in subdivisions (1) through (6).

165.    Defendant further violated Indiana Code 5-11-5.5-2(b) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Indiana by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

166.    The State of Indiana, by and through the school districts, and unaware of

46

Defendant's conduct, paid the claims submitted by Defendant.

167.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of Indiana in connection with Defendant's conduct. Compliance with applicable Indiana statutes and regulations was also an express condition of payment of claims submitted to the school districts.

168.    Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

169.    As a result of Defendant's violations of Indiana Code 5-11-5.5-2(b), the State of Indiana has been damaged in an amount in excess of millions of dollars, exclusive of interest.

170.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to Indiana Code 5-11-5.5-4 on behalf of himself and the State of Indiana.

171.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Indiana school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF INDIANA:

      (1)    Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendant's conduct;

47

(2)    A civil penalty of not less than $5,000 for each false claim which Defendant caused to be presented to the State of Indiana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Indiana Code 5-11-5.5-6 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT VIII
### Massachusetts False Claims Act

172.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

173.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 § 5A, *et seq.*

174.    Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the Commonwealth;

(3) conspires to defraud the Commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

. . .

48

(9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

175. Defendant further violated Mass. Gen. Laws Ann. Chap. 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the Commonwealth of Massachusetts by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

176. The Commonwealth of Massachusetts, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

177. Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendant's conduct. Compliance with applicable Massachusetts statutes and regulations was also an express condition of payment of claims submitted to the school districts.

178. Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

179. As a result of Defendant's violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount in excess of millions of dollars, exclusive of interest.

180. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Ann.

49

Chap. 12 § 5C(2)-(6) on behalf of himself and the Commonwealth of Massachusetts.

181.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Massachusetts school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the Commonwealth OF MASSACHUSETTS:

(1)    Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the Commonwealth of Massachusetts;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12, § 5F and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

50

## COUNT IX
### Minnesota False Claims Act

182.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

183.    This is a *qui tam* action brought by Relator on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01, *et seq.*

184.    Minnesota False Claims Act, M.S.A. § 15C.02(a), provides for liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;
>
> (3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim.

185.    Defendant further violated M.S.A. § 15C.02(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Minnesota by its deliberate and systematic violation of the federal E-Rate statute, rules and regultions, particularly the LCP requirement.

186.    The State of Minnesota, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

187.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims

51

submitted to the State of Minnesota in connection with Defendant's conduct. Compliance with applicable Minnesota statutes and regulations was also an express condition of payment of claims submitted to the school districts.

188.    Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

189.    As a result of Defendant's violations of M.S.A. § 15C.02(a), the State of Minnesota has been damaged in an amount in excess of millions of dollars, exclusive of interest.

190.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to M.S.A. § 15C.05 on behalf of himself and the State of Minnesota.

191.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Minnesota school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MINNESOTA:

(1)    Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Minnesota;

(3)    Prejudgment interest; and

52

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to to M.S.A. § 15C.13 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT X
### Montana False Claims Act

192.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

193.    This is a *qui tam* action brought by Relator on behalf of the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MCA § 17-8-401, *et seq.*

194.    Montana's False Claims Act, MCA § 17-8-403(1), provides for liability for any person who:

(a) knowingly presents or causes to be presented to an officer or employee of the governmental entity a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the governmental entity;

(c) conspires to defraud the governmental entity by getting a false or fraudulent claim allowed or paid by the governmental entity;

. . .

53

(h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

195.    Defendant further violated MCA § 17-8-403(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Montana by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

196.    The State of Montana, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

197.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of Montana in connection with Defendant's conduct. Compliance with applicable Montana statutes and regulations was also an express condition of payment of claims submitted to the school districts.

198.    Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

199.    As a result of Defendant's violations of MCA § 17-8-403(1), the State of Montana has been damaged in an amount in excess of millions of dollars, exclusive of interest.

200.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to MCA § 17-8-406 on behalf

54

of himself and the State of Montana.

201.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Montana school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MONTANA:

(1)    Three times the amount of actual damages which the State of Montana has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Montana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to MCA § 17-8-410 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XI
### Nevada False Claims Act

202.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

203.    This is a *qui tam* action brought by Relator on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010, *et seq.*

204.    N.R.S. § 357.040(1) provides liability for any person who:

(a) knowingly presents or causes to be presented a false claim for payment or approval;

(b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

(c) conspires to defraud by obtaining allowance or payment of a false claim;

. . .

(h) is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

205.    Defendant further violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Nevada by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

206.    The State of Nevada, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

207.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims

56

submitted to the State of Nevada in connection with Defendant's conduct. Compliance with applicable Nevada statutes and regulations was also an express condition of payment of claims submitted to the school districts.

208. Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

209. As a result of Defendant's violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount in excess of millions of dollars, exclusive of interest.

210. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to N.R.S. § 357.080 on behalf of himself and the State of Nevada.

211. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Nevada school districts.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEVADA:

(1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Nevada;

(3) Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XII
### New Jersey False Claims Act

212.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

213.    This is a *qui tam* action brought by Relator on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1, *et seq.*

214.    New Jersey False Claims Act, N.J.S.A. § 2A:32C-3, provides for liability for any person who:

a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

c. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

215.    Defendant further violated N.J.S.A. § 2A:32C-3 and knowingly caused hundreds

58

of thousands of false claims to be made, used and presented to school districts in the State of New Jersey by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

216. The State of New Jersey, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

217. Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of New Jersey in connection with Defendant's conduct. Compliance with applicable New Jersey statutes and regulations was also an express condition of payment of claims submitted to the school districts.

218. Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

219. As a result of Defendant's violations of N.J.S.A. § 2A:32C-3, the State of New Jersey has been damaged in an amount in excess of millions of dollars, exclusive of interest.

220. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to N.J.S.A. § 2A:32C-5(b)-(i) on behalf of himself and the State of New Jersey.

221. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the New Jersey school districts.

59

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NEW JERSEY:

(1)   Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendant's conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Jersey;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relator:

(1)   The maximum amount allowed pursuant to N.J.S.A. § 2A:32C-7 and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT XIII
### New Mexico Fraud Against Taxpayers Act

222.   Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

223.   This is a *qui tam* action brought by Relator on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1, *et seq.*

224.   New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-3(A),

provides:

> A person shall not:
>
> (1)  knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee, or other recipient of state funds, a false or fraudulent claim for payment or approval;
>
> (2)  knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim; or
>
> (3)  conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim.

225.    Defendant further violated N.M. Stat. Ann. §§ 44-9-3(A) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of New Mexico by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

226.    The State of New Mexico, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

227.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of New Mexico in connection with Defendant's conduct.  Compliance with applicable New Mexico statutes and regulations was also an express condition of payment of claims submitted to the school districts.

228.    Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate program or were premised on false and/or misleading information, they would not have paid the claims.

229.    As a result of Defendant's violations of N.M. Stat. Ann. §§ 44-9-3(A), the State of New Mexico has been damaged in an amount in excess of millions of dollars, exclusive of interest.

230.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.M. Stat. Ann. §§ 44-9-5 on behalf of himself and the State of New Mexico.

231.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the New Mexico school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NEW MEXICO:

(1)    Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Mexico;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 44-9-7 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

62

(4)    Such further relief as this Court deems equitable and just.

## COUNT XIV
### New York False Claims Act

232.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

233.    This is a *qui tam* action brought by Relator on behalf of the State of New York to recover treble damages and civil penalties under the New York State False Claims Act, State Finance Law § 186, *et seq.*

234.    New York State False Claims Act, State Finance Law § 189, provides for liability for any person who:

> (a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

> (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (c) conspires to commit a violation of (a), (b), (d), (e), (f), or (g) of this subdivision;

235.    Defendant further violated State Finance Law § 189 and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of New York by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

236.    The State of New York, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

237.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims

submitted to the State of New York in connection with Defendant's conduct. Compliance with applicable New York statutes and regulations was also an express condition of payment of claims submitted to the school districts.

238. Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

239. As a result of Defendant's violations of State Finance Law § 189, the State of New York has been damaged in an amount in excess of millions of dollars, exclusive of interest.

240. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to State Finance Law § 190(2) on behalf of himself and the State of New York.

241. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the New York school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NEW YORK:

    (1)    Three times the amount of actual damages which the State of New York has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendant caused to be presented to the State of New York;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relator:

    (1)    The maximum amount allowed pursuant to the State Finance Law § 190(6), and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XV
### North Carolina False Claims Act

242.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

243.    This is a *qui tam* action brought by Relator on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C.G.S.A. § 1-605, *et seq.*

244.    North Carolina's False Claims Act, N.C.G.S.A. § 1-607(a), provides for liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

245.    Defendant further violated N.C.G.S.A. § 1-607(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the

65

State of North Carolina by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

246. The State of North Carolina, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

247. Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of North Carolina in connection with Defendant's conduct. Compliance with applicable North Carolina statutes and regulations was also an express condition of payment of claims submitted to the school districts.

248. Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

249. As a result of Defendant's violations of N.C.G.S.A. § 1-607(a), the State of North Carolina has been damaged in an amount in excess of millions of dollars, exclusive of interest.

250. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to N.C.G.S.A. § 1-608(b) on behalf of himself and the State of North Carolina.

251. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the North Carolina school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages

66

to the following parties and against Defendant:

To the STATE OF NORTH CAROLINA:

(1)    Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of North Carolina;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to N.C.G.S.A. § 1-610(b) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XVI
### Rhode Island False Claims Act

252.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

253.    This is a *qui tam* action brought by Relator on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, Gen. Laws 1956, § 9-1.1-1, *et seq.*

254.    Rhode Island's False Claims Act, Gen. Laws 1956, § 9-1.1-3(a), provides for liability for any person who:

67

(1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state; or

(3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

255. Defendant further violated Gen. Laws 1956, § 9-1.1-3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Rhode Island by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

256. The State of Rhode Island, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

257. Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of Rhode Island in connection with Defendant's conduct. Compliance with applicable Rhode Island statutes and regulations was also an express condition of payment of claims submitted to the school districts.

258. Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

259. As a result of Defendant's violations of Gen. Laws 1956, § 9-1.1-3(a), the State of Rhode Island has been damaged in an amount in excess of millions of dollars, exclusive of interest.

260.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to Gen. Laws 1956, § 9-1.1-4(b) on behalf of himself and the State of Rhode Island.

261.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Rhode Island school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF RHODE ISLAND:

(1)    Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Rhode Island;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Gen. Laws 1956, § 9-1.1-4(d) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

69

## COUNT XVII
### Tennessee False Claims Act

262.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

263.    This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee False Claims Act, Tenn. Code § 4-18-101, *et seq.*

264.    Tenn. Code § 4-18-103(a) provides liability for any person who:

> (1) Knowingly presents or causes to be presented to an officer or employee of the state or any subdivision thereof, a false claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
>
> (3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;
>
> . . .
>
> (8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

265.    Defendant further violated Tenn. Code § 4-18-103(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the State of Tennessee by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

266.    The State of Tennessee, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

70

267.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the State of Tennessee in connection with Defendant's conduct.  Compliance with applicable Tennessee statutes and regulations was also an express condition of payment of claims submitted to the school districts.

268.    Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

269.    As a result of Defendant's violations of Tenn. Code § 4-18-103(a), the State of Tennessee has been damaged in an amount in excess of millions of dollars, exclusive of interest.

270.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code § 4-18-104(c) on behalf of himself and the State of Tennessee.

271.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Tennessee school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF TENNESSEE:

(1)    Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's conduct;

71

(2)    A civil penalty of not less than $2,500 and not more than $5,000 for each false claim which Defendant caused to be presented to the State of Tennessee;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Tenn. Code Ann. § 4-18-104(g) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XVIII
### Virginia Fraud Against Taxpayers Act

272.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

273.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, Virginia Code § 8.01-216.1, *et seq.*

274.    Virginia Code § 8.01-216.3a provides liability for any person who-

1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

2. Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the Commonwealth; or

3. Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7.

72

275.   Defendant further violated Virginia Code § 8.01-216.3a and knowingly caused hundreds of thousands of false claims to be made, used and presented to school districts in the Commonwealth of Virginia by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

276.   The Commonwealth of Virginia, by and through the school districts, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

277.   Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendant's conduct. Compliance with applicable Virginia statutes and regulations was also an express condition of payment of claims submitted to the school districts.

278.   Had the school districts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, they would not have paid the claims.

279.   As a result of Defendant's violations of Virginia Code § 8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount in excess of millions of dollars, exclusive of interest.

280.   Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia Code § 8.01-216.5 on behalf of himself and the Commonwealth of Virginia.

281.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Virginia school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the COMMONWEALTH OF VIRGINIA:

(1)    Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the Commonwealth of Virginia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to VA Code § 8.01-216.7 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XIX
### District of Columbia Procurement Reform Amendment Act

282.   Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

283.   This is a *qui tam* action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.13, *et seq.*

284.   D.C. Code § 2-308.14(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the District, a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

(3) conspires to defraud the District by getting a false claim allowed or paid by the District;

(8) is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

285.   Defendant further violated D.C. Code § 2-308.14(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the school district of the District of Columbia by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

286.   The District of Columbia, by and through its school district, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

287.   Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims

75

submitted to the District of Columbia in connection with Defendant's conduct. Compliance with applicable District of Columbia statutes, ordinances and regulations was also an express condition of payment of claims submitted to the school district.

288.    Had the school district known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate Program or were premised on false and/or misleading information, it would not have paid the claims.

289.    As a result of Defendant's violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged in an amount in excess of millions of dollars, exclusive of interest.

290.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to D.C. Code § 2-308.14(b) on behalf of himself and the District of Columbia.

291.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia school district.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the DISTRICT OF COLUMBIA:

(1)    Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's illegal conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the District of Columbia;

(3)    Prejudgment interest; and

76

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XX
### City of Chicago False Claims Act

292.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

293.    This is a *qui tam* action brought by Relator and the City of Chicago to recover treble damages and civil penalties under the Chicago False Claims Act, Chapter 1-22-10, *et seq.*

294.    The City of Chicago False Claims Act, Chapter 1-22-20, provides for liability for any person who:

(1) knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city; or

(3) conspires to defraud the city by getting a false or fraudulent claim allowed or paid.

295.    Defendant further violated Chapter 1-22-20 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the school district of the City of

Chicago by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

296.    The City of Chicago, by and through its school district, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

297.    Compliance with applicable E-Rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the City of Chicago in connection with Defendant's conduct.  Compliance with applicable City of Chicago statutes, ordinances and regulations was also an express condition of payment of claims submitted to the school district.

298.    Had the school district known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate program or were premised on false and/or misleading information, it would not have paid the claims.

299.    As a result of Defendant's violations of Chapter 1-22-20, the City of Chicago has been damaged in an amount in excess of millions of dollars, exclusive of interest.

300.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to Chapter 1-22-030(b) on behalf of himself and the City of Chicago.

301.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the City of Chicago school district.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the CITY OF CHICAGO:

  (1)  Three times the amount of actual damages which the City of Chicago has sustained as a result of Defendant's illegal conduct;

  (2)  A civil penalty of not less than $500 and not more than $1,000 for each false claim which Defendant caused to be presented to the City of Chicago;

  (3)  Prejudgment interest; and

  (4)  All costs incurred in bringing this action.

To Relator:

  (1)  The maximum amount allowed pursuant to Chapter 1-22-030(d) and/or any other applicable provision of law;

  (2)  Reimbursement for reasonable expenses which Relator incurred in connection with this action;

  (3)  An award of reasonable attorneys' fees and costs; and

  (4)  Such further relief as this Court deems equitable and just.

## COUNT XXI
### New York City False Claims Act

302. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

303. This is a *qui tam* action brought by Relator and the City of New York to recover treble damages and civil penalties under the New York City False Claims Act, Admin. Code § 7-801, *et seq.*

79

304.    The New York City False Claims Act, Admin. Code § 7-803, provides liability for any person who:

> 1. knowingly presents, or causes to be presented, to any city officer or employee, a false claim for payment or approval by the city;

> 2. knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the city; or

> 3. conspires to defraud the city by getting a false claim allowed or paid by the city.

305.    Defendant further violated Admin. Code § 7-803 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the school district of the City of New York by its deliberate and systematic violation of the federal E-Rate statute, rules and regulations, particularly the LCP requirement.

306.    The City of New York, by and through its school district, and unaware of Defendant's conduct, paid the claims submitted by Defendant.

307.    Compliance with applicable e-rate rules and regulations and the various other federal and state laws cited herein was an express, and implied, condition of payment of claims submitted to the City of New York in connection with Defendant's conduct.  Compliance with applicable New York City statutes, ordinances and regulations was also an express condition of payment of claims submitted to the school district.

308.    Had the school district known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the E-Rate program or were premised on false and/or misleading information, it would not have paid the claims.

309. As a result of Defendant's violations of Admin. Code § 7-803, the City of New York has been damaged in an amount in excess of millions of dollars, exclusive of interest.

310. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Admin. Code § 7-804(b) on behalf of himself and the City of New York.

311. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the New York City school districts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the CITY OF NEW YORK:

(1) Three times the amount of actual damages which the City of New York has sustained as a result of Defendant's illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $15,000 for each false claim which Defendant caused to be presented to the City of New York;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the Admin. Code § 7-804(i) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

81

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against AT&T as follows:

A.    That AT&T be ordered to conduct an accounting to determine the extent and amount of its overbilling of the USF, the States, D.C, and the Cities;

B.    That judgment be entered in favor of the United States and against AT&T in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus civil penalties and statutory damages to the maximum extent allowed under the False Claims Act;

C.    For all damages suffered by the United States, together with costs and all available pre- and post-judgment interest;

D.    That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

E.    That judgment be granted for Relator and the United States and against AT&T for all costs, including, but not limited to, court costs, expert fees, investigative expenses, other costs incurred in investigating and prosecuting this matter, and all attorneys' fees incurred by Relator and the United States in the prosecution of this suit;

F.    That all relief be entered in flavor of the States, D.C., and the Cities, and Relator, as set out in Counts II through XXI above;

G.    That the United States, the States, D.C., and the Cities be granted such other and further relief as the Court deems just and proper.

<u>JURY TRIAL DEMANDED</u>

Relator, on behalf of the United States, the States, D.C., and the Cities, hereby demands a jury trial on all claims so triable.

Dated: October 28, 2011

By: _Patrick A. Klingman_

Patrick A. Klingman (D.C. Bar # 435136)
SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: 860/526-1100
Facsimile: 860/526- 1120
pklingman@sfmslaw.com

Scott R. Shepherd
SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
35 East State Street
Media, PA 19063
Telephone: 610/891-9880
Facsimile: 610/891-9883
sshepherd@sfmslaw.com

Douglas P. Dehler
SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
111 E. Wisconsin Avenue, Suite 1750
Milwaukee, WI 53202
Telephone: 414/226-9900
Facsimile: 414/226-9905
ddehler@sfmslaw.com

Counsel for Relator Todd Heath,
On Behalf of The United States of
America, the States of California,
Delaware, Florida, Hawaii, Illinois,
Indiana, Massachusetts, Minnesota,
Montana, Nevada, New Jersey, New
Mexico, New York, North Carolina,
Rhode Island, Tennessee, Virginia, the
District of Columbia, the City of Chicago,
and the City of New York

83